Joseph MAZZI, Plaintiff-Appellant,

v.

GREENLEE TOOL CO. and Greenlee Bros. & Co., Defendants-Appellees.

No. 195, Docket 25727.

United States Court of Appeals Second Circuit.

Argued Jan. 15, 1963.

Decided July 22, 1963.

Sassower & Sassower, New York City (George Sassower, Doris L. Sassower, New York City, on the brief), for appellant.

Rudser & Fitzmaurice, New York City (William F. McNulty, David G. Fitzmaurice, New York City, of counsel), for appellees.

Before MEDINA, WATERMAN and MOORE, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

This diversity action was commenced to recover for personal injuries sustained by plaintiff as the result of an accident occurring in the course of his employment. On the date of the accident, plaintiff was employed as a machine operator by the Special Machine Co., Inc., and was operating a hydraulic "press type" machine, manufactured by the K. R. Wilson Company (hereinafter referred to as Wilson), to which was attached a cast iron pipe-bending shoe manufactured by defendant Greenlee

Bros. & Co.[1] (hereinafter Greenlee). The shoe had been purchased by plaintiff's employer from George W. Warner & Co., a retail dealer in various types of pipe-bending equipment and before being attached to the Wilson press had been subjected to certain alterations. The operation plaintiff was performing was that of bending a four-foot-long helicopter leg to make it conform to certain specifications. In the process, the shoe broke and plaintiff was injured.

Plaintiff brought suit against the manufacturer of the shoe claiming negligence in its design and manufacture. After nine days of trial, at the close of the entire case, the trial judge directed a verdict in defendant's favor on the ground that the doctrine of MacPherson v. Buick, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696 (1916), relied on by plaintiff, was inapplicable because: (1) the Greenlee shoe was designed and intended for use only on a Greenlee press and, (2) after being acquired by plaintiff's employer, the shoe had been subjected to certain structural changes so that it could be adapted for use on the Wilson press with the result that when the accident occurred the device was no longer the article that defendant had produced.

Appellant contends, first, that from the evidence adduced at trial, the jury could reasonably have found that use of the shoe on a Wilson rather than a Greenlee press played no part in the chain of causation and that, in any event, proof of a trade custom of interchangeability and other evidence indicated that such use was intended or was at least sufficiently foreseeable so that failure to warn against the danger of such usage constituted negligence on the manufacturer's part. Secondly, appellant urges that the evidence relating to alteration of the shoe presented a sharply contested issue of causation that should have been resolved by the jury. We agree and reverse for a new trial.

1. It has been stipulated that any liability that attaches to the defendant Greenlee Bros. & Co. shall extend to the defend-

*Intended Use*

■ This case is controlled by the substantive law of New York, and as New York applies the doctrine of MacPherson v. Buick, supra, there can be no recovery against a manufacturer if its product was not used for the purpose and in the manner intended. Genesee County Patrons Fire Relief Ass'n v. L. Sonneborn Sons, Inc., 263 N.Y. 463, 189 N.E. 551 (1934); Noone v. Fred Perlberg, Inc., 268 App.Div. 149, 49 N.Y.S.2d 460 (1st Dep't 1944); Crist v. Art Metal Works, 230 App.Div. 114, 243 N.Y.S. 496 (1st Dep't 1930); Harper v. Remington Arms Co., 156 Misc. 53, 280 N.Y.S. 862 (Sup. Ct.1935), aff'd 248 App.Div. 713, 290 N.Y.S. 130 (1st Dep't 1936), motion for leave to appeal denied, 272 N.Y. 675, 290 N.Y.S. 130. See also Hentschel v. Baby Bathinette Corp., 215 F.2d 102 (2d Cir. 1954) (applying Michigan law); Haberly v. Reardon Co., 319 S.W.2d 859 (Mo.1958) (applying New York law); Prosser, Torts, § 84 (2d ed. 1955); Frumer & Friedman, Products Liability, § 15.01 (1960 ed.); Noel, Manufacturer's Negligence of Design or Direction for Use of a Product, 71 Yale L. J. 816, 855 (1962); Restatement, Torts, § 388 (1934).

Whether this doctrine of intended use, relied on by the court below, is applicable to the case at bar must depend on the evidence adduced at trial. If, as appellant contends, sufficient evidence was introduced to warrant a jury finding that the accident was caused by a defect in the shoe and not by its use on a Wilson press, the doctrine of intended use would not bar recovery. The same result would attach if the evidence was such that a jury could reasonably find that use on a Wilson press was intended by the manufacturer or was reasonably foreseeable and that failure to warn against the danger of such usage constituted negligence in the circumstances. See Genesee County Patrons Fire Relief Ass'n v. L. Sonneborn Sons, Inc., supra, 263 N.Y. at

ant Greenlee Tool Co., a corporate affiliate which acts as national sales agent for the manufacturer's products.

824

468, 189 N.E. at 533, in which the New York Court of Appeals, in dealing with a similar problem, said:

> "Here the manufacturer knew, or should have known, that the preparation was to be used by employees of the corporation purchaser in an enclosed structure. True it is that the correspondence referred to silos, but the water tank in which it was used was constructed of the same materials as silos but was not as large. Plaintiff's expert testified, however, that the same effect would be produced by its use in a silo."

See, also, Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623 (2d Cir. 1961); Frumer & Friedman, Products Liability § 15.01 (1960 ed.). A somewhat detailed review of the evidence is therefore necessary.

The pipe-bending machines manufactured by both Greenlee and Wilson operate on the same mechanical principle. The pipe to be bent is laid with its ends across two supporting blocks and pressure is applied, via the shoe, to its center at which point the inner curved face of the shoe makes contact. The shoe is attached to a ram or piston and, by means of a manually operated lever, hydraulic pressure is applied until the desired bend in the pipe is achieved. Thus, the pipe-bending operation can be described in either of two ways; the ram, with the shoe attached, is bending the pipe in the middle or, the pressure of the blocks supporting the pipe works to bend the ends back toward the ram. The inner curved face of the shoe acts as a mold and its contours determine the shape the pipe will assume.

Despite this identity of mechanical principle, however, the machines of the two companies are quite different in design. The Wilson machine being operated by plaintiff at the time of the accident is described in the company's literature as a "60 ton Hand Operated Hydraulic Press" and performs functions other than bending pipe. It is a stationary press standing between six and one-half and seven feet tall. Because the ram of the Wilson press, which stands upright on the floor, moves vertically, the operator is required to stand in front of the press with his face about three feet away from the moving ram.

The "Greenlee Hydraulic Conduit Bender," on the other hand, is designed solely for bending pipe and is a portable press. It is much smaller than the Wilson press and while in operation lies flat on the floor with its ram moving on a horizontal plane parallel to the floor. The Greenlee machine is manufactured and sold in two models, one with a maximum piston pressure of 25 tons per square inch and the other with a maximum of 40 tons per square inch. Both models are equipped with safety valves that blow out when pressure reaches the danger point. As its name indicates, the Wilson press has a maximum pressure of sixty tons per square inch.

Defendant's chief staff engineer testified that Greenlee shoes, which come in various sizes depending on the circumference of the pipe to be bent, are not sold as single items to be used in any machine other than a Greenlee press, that they are listed in Greenlee catalogues and sales literature as accessories of the Greenlee press and that no indication is given that they are adaptable for use in other make machines. He testified further that the shoe in question was designed to bend three-inch pipe in either of the Greenlee press models which produced a maximum of forty tons pressure.

The chief engineer of plaintiff's employer testified that Greenlee shoes were attached to the Greenlee and Wilson presses in the same manner and that the shoe is subjected to the same pressure whether attached to a Wilson or Greenlee press. He also testified that it was the custom in the trade to buy the shoes independently of the machines,[2] and that when so purchased no instructions concerning their use or limitation were pro-

2. The parties have stipulated that Greenlee shoes are sold independently of the machines.

vided. The assistant foreman of plaintiff's employer testified that it was common practice to "adapt one shoe from one press to another press," and that no alterations to the shoe were necessary to attach it to the Wilson press.

The president of George W. Warner, Inc., the retailer which sold the shoe to plaintiff's employer, testified that at the time of the accident Greenlee shoes were customarily sold as separate units and when sold no inquiry was made by the retailer as to their prospective use. He testified further that the shoes were not packaged individually, that no literature accompanied them, and that the name Greenlee was not inscribed on the shoe.

■ This evidence, and the evidence relating to the cause of the accident to be summarized infra, was sufficient to support a jury resolution that the use of the shoe on a Wilson rather than a Greenlee press did not cause the accident or that such usage was intended or that defendant should have reasonably foreseen that its shoe would be so used and that failure to warn of the danger involved in such usage constituted negligence. Thus, insofar as the doctrine of intended use relates to the use of the shoe on a Wilson rather than a Greenlee press, the issues should have been submitted to the jury and defendant's directed verdict cannot stand on that ground.

*Structural alteration*

The second ground upon which the trial court directed a verdict was that the Greenlee shoe was so altered by plaintiff that it "became no longer the article which defendant turned out, but something else." This holding assumes that the substantive law of New York establishes that a manufacturer cannot be held liable under MacPherson if his product was substantially or structurally changed after sale. Presumably, what constitutes a structural change would be a question of law for the court to decide. The only authority advanced for this proposition is Kluttz v. Citron, 2 N.Y.2d

379, 161 N.Y.S.2d 26, 141 N.E.2d 547 (1957). In that case, the New York Court of Appeals, by a sharply divided court, held that the plaintiff-workman's alteration of a ladder provided for his use by the defendant-homeowner, took the case out of the ambit of Section 240 of the New York Labor Law, McK.Consol. Laws, c. 31. The dissenting judges based their disagreement on the ground that "the fact that plaintiff cut a piece from the ladder furnished by defendant has nothing whatever to do with the case since that cutting was in no sense the cause of or related to the accident." 2 N.Y.2d at 384, 161 N.Y.S.2d at 30, 141 N.E.2d at 550.

Although at first glance this case seems to support defendant's contention, the majority went on to say that the plaintiff, an experienced workman, by acting as he had, "effectively removed himself from the protective language of the statute and thereby relegated himself to such remedy, if any, which might be said to exist at common law." Id. at 383, 161 N.Y.S.2d at 29, 141 N.E.2d at 549. The plaintiff there had elected not to rely on defendant's alleged neglect of a common law duty. Thus, it seems to us that the essence of the Kluttz decision is that before the strict liability of Section 240 will be imposed, a plaintiff must bring his case within the precise wording of that statute, and failing that the plaintiff must resort to common law principles of liability.[3]

■ As to the precise scope of these common law principles, we have found no New York authority indicating a clear course to decision of the case at bar. Thus, aware of our responsibility to employ "all the available data" in implementing the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must resort to the customary judicial process to determine and apply state law to the case before us. West v. American Tel. & Tel. Co., 311 U.S. 223, 236–237, 61 S.Ct. 179, 85 L.Ed.

3. Young v. Aeroil Products Co., 248 F.2d 185 (9th Cir. 1957) (applying California law) seems also limited to a strict liability situation.

139 (1940); Bernhardt v. Polygraphic Co., 350 U.S. 198, 204–205, 76 S.Ct. 273, 100 L.Ed. 199 (1956); Allen v. Cohen, 310 F.2d 312, 315 (2d Cir. 1962); Strubbe v. Sonnenschein, 299 F.2d 185, 188–189 (2d Cir. 1962).

■■■ Under traditional concepts of tort law, a defendant cannot be held responsible for his negligent acts if a subsequent force is the superseding cause of the injury. Restatement, Torts, § 440 (1934). Applying this principle to the case before us, the manufacturer would not be liable for plaintiff's injury, despite its own negligence, if the intervening alteration of the product was the superseding cause of those injuries. On the other hand, the mere fact that there has been some alteration of the product does not, as a matter of law, relieve the manufacturer of liability otherwise attaching to it. See Webb v. Olin Mathieson Chem. Corp., 9 Utah 2d 275, 342 P.2d 1094, 80 A.L.R.2d 476 (1959). See also Solomon v. Red River Lumber Co., 56 Cal.App. 742, 206 P. 498, 503–504 (1922); Reiss v. Kirkman & Son, Inc., 242 App.Div. 77, 78, 273 N.Y.S. 7, 8 (2d Dep't 1934); Noone v. Fred Perlberg, Inc., 268 App. Div. 149, 151, 49 N.Y.S.2d 460, 461 (1st Dep't 1944). This, it seems to us, must be the essence of any doctrine of "substantial alteration", and if the evidence was such that the jury could reasonably have found that the alterations in question were not a superseding cause of the injury, it was error to direct a verdict on that ground. Again, we must turn to the evidence adduced at trial.

It is undisputed that plaintiff's employer machined out a portion of metal from the concave portion of the shoe.[4] This machining changed the contour of the shoe and created two "grooves" or a "trough" at the point where the shoe came in contact with the pipe. This machined out area was approximately 3 inches long, 1 and 7/16ths inches wide and 1/4 of an inch deep at its deepest point. Plaintiff's witnesses testified that this operation was performed to remove the roughness of the cast iron shoe so that it would not mar the highly polished helicopter leg.

Turning to the question of causation, plaintiff's engineering expert testified that the machined out area had nothing to do with the shoe's failure. It was his opinion that this type shoe should never have been subjected to more than twelve or fifteen tons of pressure and that weaknesses in the shoe caused its breakage. A metallurgist called by plaintiff testified that he had microscopically examined a portion of the shoe in question and found thirty-three cracks in a 3/8ths inch specimen of the shoe near the fracture site. It was his opinion that these cracks, some of which were perceptible to the naked eye, were the result of a faulty casting process. There was also considerable testimony to the effect that the shoe fractured because of sheer or tensile force and not because of compressive force. This evidence was significant because it tended to show that the machined out area, which might have lessened the shoe's compressive strength, played no part in the failure of the shoe.

On the other hand, defendant's chief staff engineer testified that the machined out area changed the distribution of load on the shoe and created stress risers that had the effect that would be produced by putting a notch in a piece of kindling before applying pressure to it. Other defense witnesses testified to the same effect and also that the shoe was constructed of good commercial grade cast iron and that it was satisfactory for the purpose intended.[5]

---

4. Approximately one to one-and-a-quarter cubic inches of metal were also removed from either end of the shoe ("the flanges"). However, experts for both parties, with the exception of one who was unable to form an opinion, testified that this alteration had nothing to do with the shoe's failure.

5. On cross-examination, plaintiff admitted that just before the accident occurred, the pressure gauge read "something underneath the 40 mark" and that he was "still pumping" when the accident occurred.

Thus, this evidence presented a sharply contested issue of fact for the jury and was sufficient to support a jury resolution that the alteration of the shoe had no effect in the chain of causation between manufacture and harm. We conclude, therefore, that it was error for the trial court to direct a verdict for the defendant on this ground, the issues on this phase of the case being properly for the jury.

Reversed and remanded.