475 A.2d 1243

**Anderson BANKS**

v.

**IRON HUSTLER CORPORATION.**

**No. 1396, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

June 8, 1984.

**410**

Eugene A. Shapiro, Baltimore, for appellant.

Thomas N. Biddison, Jr., Baltimore, with whom were Gallagher, Evelius & Jones, Baltimore, on the brief, for appellee.

Argued before LOWE, WILNER and ALPERT, JJ.

WILNER, Judge.

This is a product liability case. Anderson Banks was injured at work when his hand became caught on a conveyor belt; he sued the manufacturer of the conveyor, Iron Hustler Corporation (Iron Hustler), claiming both strict liability and negligence in design. The Circuit Court for Baltimore City, by granting Iron Hustler's motion for directed verdict, found as a matter of law that there was no liability. Hence this appeal.

We shall reverse.

The accident occurred on May 25, 1979, at the Brooklyn Salvage and Waste Company (Brooklyn), where Mr. Banks was employed. Brooklyn had purchased the conveyor from Iron Hustler in 1966. Its function was to move scrap metal up an inclined plane from a processing table to waiting railroad cars. The conveyor was forty-four feet long, and, although there was no evidence as to the precise angle of the incline, it appears from certain photographs and from estimates made by one of the witnesses that the conveyor began at about ground level and rose to an elevation of over thirteen feet.

The three-foot wide belt is a rather heavy piece of rubber, and it is therefore necessary to provide support for it on both top (the upper part of the belt actually carrying the scrap up to the railroad car) and bottom (the empty part making the downward return to the processing table). When purchased from Iron Hustler in 1966, the bottom part of the belt was supported by four flat pieces of metal. The exact placement of those metal pieces along the forty-four foot length is not revealed in the record; for purposes of hypothesis on cross-examination of appellant's expert witness, it was assumed that they were spaced at about ten-foot intervals. On that assumption, their elevations would have been approximately two feet, six feet, nine to ten feet, and twelve to thirteen feet, respectively.

Each of these flat metal supports created what has been referred to as a "nip point," *i.e.*, at the point that the belt moved downward over the metal piece, the danger was presented of anything coming into contact with the belt being caught between the moving belt and the stationary metal.

At some point after the conveyor was installed and placed into operation, Brooklyn became dissatisfied with the system of flat metal supports along the bottom. According to the foreman, George Easto, the metal pieces acted like razors, and began shredding the belt as it passed over them. To remedy that problem, Brooklyn removed the four flat

metal supports and installed in their place fourteen rollers. The rollers not only avoided the shearing effect, but, because there were more of them, they provided better support for the belt. They also, of course, created ten additional "nip points," making one at about every 2.8 feet.

When manufactured and sold to Brooklyn, the underneath part of the conveyor was unshielded; there was no guard protecting a person working in the vicinity agaisnt inadvertent contact with the belt or the "nip points." No such shield was ever added by Brooklyn.

Mr. Banks and one other employee were assigned to operate the conveyor. Banks, in particular, was responsible for seeing to it that the scrap was carried up properly; if a piece of metal got stuck or became positioned so as to prevent other pieces from being carried up, it was his job to remove that piece from the top part of the belt. Depending on the nature of the problem, the belt might or might not be stopped to permit Banks to do that. Mr. Easto explained that, if a piece of metal got caught while moving up the belt, the practice was not to stop the belt, but rather "to keep the belt moving and try to keep it going." Banks confirmed that practice:

"THE COURT: Well, put it this way—were you supposed to take debris off the belt when the belt was moving?

THE WITNESS: That was my job.

THE COURT: But, were you supposed to do it while the belt was still moving?

THE WITNESS: Yes, ma'am. That was my job.

THE COURT: Weren't you supposed to stop the belt first?

THE WITNESS: (Indicating negatively). We don't stop that belt for nothing, for nothing going up there, because if you stop it, it['s] going to hang up."

If, on the other hand, a piece of metal was found hanging off the side of the belt, the proper procedure was to stop the belt before pulling it off. According to Banks, however,

his job was to "stay on the belt" and not to operate the cut-off switch. If the belt was to be stopped, he would call over to his co-worker, who was positioned near the switch and who was responsible for stopping the belt.

The accident happened when Banks noticed a piece of metal hanging over the other side of the belt and, in Banks' words, threatening "to tear the machine all to pieces." He called over for his co-worker to throw the switch, but the co-worker was not there; and so the machine was not stopped. Banks walked over to the other side of the belt and reached up to grab the piece of metal. In the course of doing so, he slipped on some loose debris under the belt and caught his hand in one of the "nip points." The record does not indicate which of the fourteen "nip points" was involved.

The gravamen of Banks' action, with respect to both the negligence and strict liability claims, was the design and sale of the conveyor by Iron Hustler without an adequate shield. That, he averred, made the machine defective and dangerous.

In support of that contention, Banks produced the testimony of Edward B. Landry, a safety engineer who for many years had been director of safety and health for the Post Office Department. Mr. Landry was familiar with the conveyor systems used by the Post Office and opined that, although there is a variance between conveyors in terms of what they have to convey, "the belt conveyor that is used for moving material, packages and loose material, bulk material, is basically the same whether it is used in the postal service or some place else." Landry said that he was "knowledgeable of conveyors used in scrap yards," that he had seen them in operation and had examined them. The court accepted him as an expert in the field of safety engineering.

Mr. Landry stated that the "nip points," whether caused by flat metal pieces or rollers, created a hazard that might

not be obvious to a workman. His testimony in that regard
was as follows:

"Q [By Defense Counsel] Now, this pinch point that
you have testified to, where the roller and the belt meet,
that creates, rather, an obvious hazard. Nobody would
purposely stick their hand in that particular location,
would they?

A Well, I would have trouble labeling it an 'obvious'
hazard. I might find it an obvious hazard in terms of my
experience, but whether or not a workman would appreci-
ate the significance of that pinch point when he was
engaged in doing some other part of his work, I think is
very speculative.

Q Well, you heard Mr. Banks testify that it was an
obvious hazard, as far as he was concerned, didn't you?

A I think he was aware that if you deliberately put
your hand in there, that something would happen to your
hand." [1]

Technology, he said, was available in 1966 to protect
against that hazard, whether the hazard was created by flat
metal supports or rollers. The "technology" was to "shield
off the underside of the conveyor framework," which could
be done by a piece of either sheet metal or "expanded
metal." Such shields were used by the post office and, for
a cost of about $300, could have been put on the conveyor
sold to Brooklyn. Mr. Landry stated that at least one other
manufacturer currently provided guards on its conveyors as
a uniform practice, although he did not know if that was its
practice in 1966.

From his examination of the Brooklyn conveyor and his
other knowledge and experience, Landry opined that the
conveyor system installed at Brooklyn "was inherently dan-
gerous and defectively designed because of the fact that the
underside of the conveyor system presented a known haz-

---

1. Banks had stated on cross-examination that he would not have put
his arm into the machine on purpose because he knew he would get
hurt if he did.

ard and risk to a person who would be working in that area." He stated further that "there was a direct relationship between the defective design, as I would term it, from a safety engineering point of view, and Mr. Banks' accident." From a safety engineer's point of view, he said, Iron Hustler "did not act prudently in the interest of safety." Ultimately, he concluded, "my opinion is that the absence of the guard was a direct cause of Mr. Banks' injuries."

Mr. Landry was asked several times about the effect of Brooklyn's modification of the machine—its replacement of the four flat supports with the fourteen rollers. It made no difference, he said; whether using flat pieces or rollers, the prudent thing was to shield the undercarriage to prevent contact with the "nip points." He explained:

"I would simply say that this case here, on a conveyor system, we know that accidents happen. We can't stop the camera when someone is in a position to get hurt, and all I would say to you, in my language as a safety engineer, is that the existence of either the strips or the rollers is simply waiting for an accident to happen, and if we know what to do to prevent that injury from happening, and it can be done within reasonable economical means, then the logical thing is to apply it."

The increase in the *number* of "nip points" occasioned by replacing four supports with fourteen would tend to increase the probability or risk of injury, Landry conceded, but not the underlying hazard itself.

Upon this record, the court entered the directed verdict, seemingly on two bases: (1) that as a matter of law, the hazard was patent and under current Maryland law no liability exists either for negligence or under strict liability where the danger is patent; and (2) as Mr. Landry "did not know or indicate that the state of the art in 1966 then or since was to include guards under the conveyor belt in salvage yards or anywhere else," Banks had failed to prove that Iron Hustler "deviated from any type of industry practice in 1966 when the guards were installed."

Banks takes issue with both reasons. He argues that the so-called "latent/patent rule" either has been or ought to be discarded in Maryland, and thus should not serve as the basis for rejecting his claim. The court also erred, he urges, in using the lack of an industry standard in 1966 as a basis for rejecting his claim under strict liability. Iron Hustler rejoins that (1) the "latent/patent rule" is alive and well and precludes liability, (2) apart from that rule, Banks failed to prove that the conveyor was defective or that there was a causal connection between the alleged defect and the injury, and (3) Banks, as a matter of law, assumed the risk of his injury by attempting to remove the metal from the belt while the belt was still running.[2]

### The Latent/Patent Rule

#### (1) *In Action Based On Negligence*

The "latent/patent rule" arose during the early development of product liability law, before the advent of strict liability and at a time when the requirement of privity severely limited actions against a manufacturer for breach of warranty. In those days, a manufacturer's liability for injury caused by a defective or dangerous product rested principally upon proof of either negligence or deceit, and the rule was, in effect, a circumscription of even those limited forms of liability. The rule and its rationale were explored in some depth by the New York Court of Appeals in *Campo v. Scofield*, 301 N.Y. 468, 95 N.E.2d 802 (1950). They were expressed thusly (95 N.E.2d p. 804):

> "If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. We have not yet reached the state where a manufacturer is under the duty of making

---

**2.** The trial court rejected Iron Hustler's charge of contributory negligence. As no cross-appeal was taken, that issue is not before us.

a machine accident proof or foolproof. Just as the manufacturer is under no obligation, in order to guard against injury resulting from deterioration, to furnish a machine that will not wear out, ... so he is under no duty to guard against injury from a patent peril or from a source manifestly dangerous. To illustrate, the manufacturer who makes, properly and free of defects, an axe or a buzz saw or an airplane with an exposed propeller, is not to be held liable if one using the axe or the buzz saw is cut by it, or if some one working around the airplane comes in contact with the propeller. In such cases, the manufacturer has the right to expect that such persons will do everything necessary to avoid such contact, for the very nature of the article gives notice and warning of the consequences to be expected, of the injuries to be suffered. In other words, the manufacturer is under no duty to render a machine or other article 'more' safe—as long as the danger to be avoided is obvious and patent to all."

To some extent, this rule seems to borrow from principles traditionally associated with the doctrines of contributory negligence or assumption of risk, but, where recognized, it is generally applied as a caveat or limitation to the defendant's primary negligence. As *Campo v. Scofield* very clearly pointed out, there simply was no duty on the part of a manufacturer to guard against patent dangers in his product; there being no such duty in the first instance, there could be no breach of duty for failing to protect against such dangers, and hence no negligence. Thus, said the Court in *Campo*, the manufacturer of an onion-crushing machine was not negligent by failing to provide either a guard sufficient to prevent the user from coming into contact with the rollers used to crush the onions or an automatic cut-off device. If a manufacturer was to be compelled "to equip complicated modern machinery with all possible protective guards or other safety devices," the Court observed (95 N.E.2d p. 805), the Legislature would have to enact the compulsion.

*Campo v. Scofield* was not the first case to enunciate or apply this rule; it did, however, serve as an important vehicle for proliferating it among other States.

Maryland joined the ranks with *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 252 A.2d 855 (1969). The plaintiff there sued both the manufacturer and the retail seller of a rotary blade power lawn mower for negligence in design, breach of warranty, and strict liability. His complaint was that the mower did not have a "dead-man" control which, when released, would stop the blade and did not contain a vertical adjustment so as to permit the blade to be raised or lowered without increasing the height of the protective housing around it. In order to mow some tall grass, the plaintiff had raised the elevation of the blade by lowering the wheels, which had the effect of raising the height of the protective housing. While mowing on a slope, he slipped on the newly mown grass; his foot slid under the housing and was struck by the spinning blade.

The Court of Appeals, in affirming the dismissal of Myers' action on demurrer, concluded that no case had been stated against either defendant. With respect to the claim of negligence, the Court held that the manufacturer of a mower is not an insurer and was under no duty to make an accident-proof product. At p. 293, 252 A.2d 855:

> "No cause of action is made out in the absence of an allegation that the injury was caused by a latent defect not known to the plaintiff or a danger not obvious to him, which was attendant on proper use, and that the manufacturer was under a duty to correct or prevent that defect or warn of the peril, at least where the injury is foreseeable and probable ... or that the article was unsafe for the use for which it was supplied...."

As authority for that proposition, the Court cited *Kientz v. Carlton*, 245 N.C. 236, 96 S.E.2d 14 (1957) which, in turn, relied upon *Campo v. Scofield*.

Myers' breach of warranty claim was rejected on the basis that the only cognizable warranty was that "the

mower was fit to cut grass safely when it was used in a normal manner, not that Myers would not be injured when he fell on the slope, and his foot slipped under the mower." 253 Md. at 296, 252 A.2d 855. Finally, the Court reaffirmed its earlier determination in *Telak v. Maszczenski*, 248 Md. 476, 237 A.2d 434 (1968), not "to espouse the cause of strict liability."

The Court confirmed its adherence to the "latent/patent rule" in *Blankenship v. Morrison Mach. Co.*, 255 Md. 241, 257 A.2d 430 (1969). Like Mr. Banks, the plaintiff there was injured on the job; his arm was caught between an unguarded squeeze roller and drum on a sanforizing machine. He sued the manufacturer of the machine for negligence and breach of warranty for failing to provide a guard or protective device, but, as in *Myers*, the case was dismissed on demurrer. The Court of Appeals, citing *Myers*, maintained its adherence to the "latent/patent rule" despite criticism that the rule "is a vestigial carryover from pre-*MacPherson* days [*MacPherson v. Buick Motor Co.* (N.Y.), 111 N.E. 1050], when deceit was needed for recovery...." *Id.*, 255 Md. 246, 257 A.2d 430. The Court, citing *Campo*, noted that "Maryland has followed New York, which still remains loyal to the vestigial carryover of the latent-patent rule." *Id.* The breach of warranty claim was rejected on grounds of lack of privity.

The "latent/patent rule" was reaffirmed again in *Patten v. Logemann Bros. Co.*, 263 Md. 364, 283 A.2d 567 (1971), a case similar on its facts to *Blankenship*. The plaintiff there was also injured at work as the result of an unshielded machine. He slipped and his hand accidentally fell into an unguarded lubrication hole in a paper baling machine, where a piston amputated several fingers. His suit against the manufacturer, apparently on a theory of negligence, was thrown out on summary judgment, which the Court of Appeals affirmed based on *Blankenship*. Once again, the Court expressly maintained its allegiance to the rule, despite the mounting criticism. of it.

Finally, in *Volkswagen of America v. Young,* 272 Md. 201, 321 A.2d 737 (1974), the Court, citing *Myers, Blankenship,* and *Patten,* observed that in a product liability action based on negligence "there can be no recovery if the danger inherent in the particular design was obvious or patent to the user of the vehicle." 272 Md. at 219–220, 321 A.2d 737. As of 1974, then, the "latent/patent rule" was alive and well in Maryland, in actions based on negligence.

Banks argues, however, that the Court of Appeals implicitly abandoned that rule in *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976), when it finally adopted strict liability as a cognizable basis of a product liability claim.

*Phipps* arose from an automobile accident. The driver and his wife sued the manufacturer in Federal court claiming a *latent* defect in the accelerator mechanism. Three theories of liability were pled—negligence (counts 1 and 4), breach of warranty (counts 2 and 5), and strict liability (counts 3 and 6). The District Court certified two questions to the Court of Appeals: (1) whether counts 3 and 6 stated a cause of action in Maryland, and (2) whether count 5, seeking damages for loss of consortium by reason of the alleged breach of warranty, stated a cause of action. Given the relevant pleadings in the case and the questions certified by the District Court, it is clear that neither the sufficiency of the negligence counts nor the "latent/patent rule" was before the Court of Appeals.

The Court answered the first question in the affirmative, adopting for the first time the doctrine of strict liability as set forth in Restatement of Torts 2d, § 402A. In doing so, it pointed out that an action based on strict liability differed from an action in negligence in that it "focuses not on the conduct of the manufacturer but rather on the product itself" and thus obviates the need to "prove any specific act of negligence on the part of the seller." 278 Md. at 344, 363 A.2d 955.

■ There is nothing in *Phipps* to suggest that the traditional action for negligence was to be subsumed in or replaced by the newly adopted strict liability. Indeed, as subsequent cases make clear, strict liability merely takes its place alongside negligence and breach of warranty as an alternative basis of liability. *See American Laundry Mach. v. Horan*, 45 Md.App. 97, 412 A.2d 407 (1980); *Jensen v. American Motors Corp.*, 50 Md.App. 226, 437 A.2d 242 (1981); *Harley-Davidson v. Wisniewski*, 50 Md. App. 339, 437 A.2d 700 (1981), *cert. denied* 292 Md. 596 (1982); *cf. Harig v. Johns-Manville Products*, 284 Md. 70, 394 A.2d 299 (1978); *see also* E. Digges, *Product Liability Revisited*, 7 U.Balt.L.Rev. 1 (1977). Accordingly, the mere recognition of this alternative cause of action would have no effect upon the elements necessary to prove an action for negligence, and would not, therefore, serve implicitly or explicitly to modify the "latent/patent rule" as applied in negligence cases.

We are persuaded that the "latent/patent rule" is an anachronism and ought to be discarded. As the Court pointed out in *Palmer v. Massey-Ferguson*, 3 Wash.App. 508, 476 P.2d 713, 719 (1970), "[t]he manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage misdesign rather than encouraging it in its obvious form."

Although the Court of Appeals on four occasions within the past fifteen years has confirmed this "vestigial carryover," it did so in at least two of those cases on the authority of *Campo v. Scofield*. It is therefore worthy to note that the New York Court of Appeals—the Court that decided *Campo* and spawned the proliferation of the rule—declared in *Micallef v. Miehle Co., D. of Miehle-Goss Dexter*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571, 573 (1976), that "[t]he time has come to depart from the patent danger rule enunciated in *Campo v. Scofield.* . . ." Finding the rule to be too rigid and not in keeping with today's world, the *Micallef* Court discarded it. In its place, the

Court adopted, as the appropriate standard in a product liability action based on negligence that

"a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended .. as well as an unintended yet reasonably foreseeable use...." *Id.,* 384 N.Y.S.2d 115, 348 N.E.2d 577.

■ Whatever may be our feeling about whether Maryland should continue to adhere to this rule, however, we can neither overrule nor ignore the decisions of our Court of Appeals. We are bound by *Myers, Blankenship, Patten,* and *Volkswagen of America,* and thus are constrained to conclude that, if the danger in the product is patent, the injured plaintiff may not recover on a theory of negligence.

That does *not* end the inquiry, however.

■ Maryland has adopted a very restrictive rule about granting directed verdicts in negligence actions. As stated in *Fowler v. Smith,* 240 Md. 240, 246, 213 A.2d 549 (1965):

"Negligence is a relative term and must be decided upon the facts of each particular case. Ordinarily it is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn.... And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury." (Emphasis in the original.)

*See also Moodie v. Santoni,* 292 Md. 582, 587–88, 441 A.2d 323 (1982); *Beahm v. Shortall,* 279 Md. 321, 341–42, 368 A.2d 1005 (1977).

■ The test of legal sufficiency, in this sense, is "whether the evidence serves to prove a fact or permits an inference of fact that would enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover." *Stein v. Overlook Joint Venture,* 246 Md. 75, 81, 227 A.2d 226 (1966); *Curley v. General Valet Service,* 270 Md. 248, 264, 311 A.2d 231 (1973); *Beahm v. Shortall, supra,* 279 Md. at 342, 368 A.2d 1005.

It is true that the three cases in which the Court of Appeals expressly applied the "latent/patent rule" reached the appellate court either from the sustaining of a demurrer (*Myers v. Montgomery Ward & Co.* and *Blankenship v. Morrison Mach. Co.,* both *supra*) or from the granting of summary judgment (*Patten v. Logemann Bros. Co., supra*). It seems clear from the briefs and the opinions in those cases, however, that the question of whether the particular danger was latent or patent was not in issue. In each of those cases, the danger or defect was explicitly or implicitly conceded to be a patent one; the issue was the "latent/patent rule" itself, whether liability was precluded *because* the danger was obvious. We do not, therefore, regard those cases as making the latency or patency of the danger necessarily a question of law.

■ Whether a particular danger is obvious or patent can depend on a number of things—the complexity of the machine, the knowledge, age, background, experience, intelligence, and training of the person injured, the extent to which his required contact with the device is routine and repetitive, whether he is subject to distractions, for example. It necessarily is a question of fact, then, and, if there is any dispute about it, the question is for the jury to decide. *See Jennings v. Tamaker Corporation,* 42 Mich.App. 310, 201 N.W.2d 654 (1972); *Byrnes v. Economic Machinery*

*Company,* 41 Mich.App. 192, 200 N.W.2d 104 (1972); *Calkins v. Sandven,* 256 Iowa 682, 129 N.W.2d 1 (1964); *Hood v. Formatron Corporation,* 488 P.2d 1281 (Okla.1971); *cf. Keeney v. Callow,* 349 S.W.2d 75 (Mo.1961). *See also* 1A Frumer and Friedman, *Products Liability,* § 7.02.

■ The evidence here sufficed, in our opinion, to create a triable issue of fact. Although Mr. Banks acknowledged that he would not deliberately have run his arm through the ringer, as Mr. Landry pointed out, "whether or not a workman would appreciate the significance of that pinch point when he was engaged in doing some other part of his work, I think is very speculative." From that, and from Banks' testimony describing the nature of his job, the jury could reasonably have found that the danger was not so obvious and patent as to defeat Banks' claim of negligence.

### (2) *In Action Based On Strict Liability*

The Maryland cases espousing the "latent/patent" rule all preceded the adoption of strict liability. The rule, as we noted, has been applied in this State only in negligence cases; it has never been applied in a strict liability case in Maryland. Here, for the first time, we must determine whether it has any application in a strict liability action.

In *Phipps,* the Court noted with apparent approval the reasoning that "in a design defect case the standard of defectiveness under § 402A, involving as it does the element of unreasonable danger, still requires a weighing of the utility of risk inherent in the design against the magnitude of the risk." 278 Md. at 345, 363 A.2d 955. In that regard, the Court cited the seven factors initially suggested by Professor Wade (*Strict Tort Liability of Manufacturers,* 19 Sw.L.J. 5, 17 (1965)) as appropriate for consideration in determining whether a product is "reasonably safe"; to wit:

" '(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable

seriousness, (4) *the obviousness of the danger,* (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.' " (Emphasis supplied.) [3]

In *Singleton v. International Harvester Co.,* 685 F.2d 112 (4th Cir.1981), the Fourth Circuit Court of Appeals construed *Phipps* as having "approved" that seven-factor analysis and determined that "[i]n a design defect case the issue is whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the

---

**3.** Eight years later, Professor Wade revised those seven factors somewhat, as follows:

"(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasability on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance."

*See* Wade, *Nature of Tort Liability for Products,* 44 Miss.L.J. 825, 837–38 (1973).

It is that restatement of the seven factors that has received more recent judicial approbation. *See Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816 (1978), *overruled on other grounds* 406 A.2d 140 (N.J.1979); *O'Brien v. Muskin Corp.,* 94 N.J. 169, 463 A.2d 298 (N.J.1983); *Roach v. Kononen/Ford Motor Co.,* 269 Or. 457, 525 P.2d 125 (1974). In either case, whether employing the criteria mentioned in *Phipps* or the revision of them, the patency of the defect or danger remains but one element to be considered.

market." *See also Johnson v. International Harvester Co.*, 702 F.2d 492 (4th Cir.1983).

Whether one focuses on the seven factors suggested by Professor Wade or the more general balancing of the utility of the risk against its magnitude, it is clear that the "obviousness" of the danger is but one element in the equation. It is *not,* as in the "latent/patent rule" an absolute bar to liability. *Byrns v. Riddell Incorporated,* 113 Ariz. 264, 550 P.2d 1065 (1976); *Brown v. North Am. Mfg. Co.,* 176 Mont. 98, 576 P.2d 711 (1978); *Dorsey v. Yoder Company,* 331 F.Supp. 753 (E.D.Pa.1971), *aff'd* 474 F.2d 1339 (3rd Cir.1973), applying Pennsylvania law; *compare Bemis Co., Inc. v. Rubush,* 427 N.E.2d 1058 (Ind.App. 1981), *cert. denied* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). The notion that a product cannot be "unreasonably" dangerous—a condition of liability under § 402A—if the danger is obvious has not found favor among the courts. *Stenberg v. Beatrice Foods Co.,* 176 Mont. 123, 576 P.2d 725 (1978); *Brown v. North Am. Mfg. Co., supra,* 576 P.2d 711.

█ Accordingly, we believe that, whatever vitality the "latent/patent rule" may have in the law of *negligence,* it has no application to an action based on strict liability. It is inconsistent with the multi-faceted balancing approach that most courts, including the Maryland Court of Appeals, have taken in strict liability cases.

### (3) *Ergo*

From what we have said, it seems clear to us that the court erred in directing a verdict on the basis of the "latent/patent rule." Insofar as the negligence action was concerned, the patency of the danger was, on this record, an issue of fact for the jury; as to the claim based on strict liability, it had no application.

### *Mr. Landry's Knowledge—Industry Practice*

The second basis of the court's ruling was its conclusion that Banks' expert witness, Mr. Landry, "did not know or

indicate that the state of the art in 1966 then or since was to include guards under the conveyor belt in salvage yards or anywhere else." That just simply is not the case. We have summarized Mr. Landry's testimony. He said that he *was* knowledgeable about conveyor systems in both the Post Office and in scrap yards, and he further testified that shields could have been and often were easily installed under those machines in 1966. In a 1939 publication, he said, the National Safety Council "identified the hazards of persons getting caught in various moving parts of the conveyor" and warned "that those parts that presented that hazard should be protected or guarded against."

 Even if the court's interpretation of Mr. Landry's testimony were correct, however, it would be irrelevant with respect to the strict liability claim. Liability under § 402A exists even though "the seller has exercised all possible care in the preparation and sale of his product. . . ." Restatement of Torts 2d, § 402A(2)(a). Thus, although the issue of a manufacturer's compliance with industry standards may be relevant to a claim based on negligence, it is "generally considered to be irrelevant in a strict liability case." *Rexrode v. American Laundry Press Co.*, 674 F.2d 826 (10th Cir.), *cert. denied* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). *See also Parrillo v. Giroux Co., Inc.*, 426 A.2d 1313 (R.I.1981); *Gelsumino v. E.W. Bliss Company*, 10 Ill.App.3d 604, 295 N.E.2d 110 (1973). Accordingly, the second basis used by the court in granting the directed verdict was also incorrect.

### Brooklyn's Alterations—Causation

Iron Hustler, as we noted, does not rest solely upon the two grounds cited by the trial court. It argues as well that Banks failed to prove that he was injured by any defect existing at the time the conveyor was sold to Brooklyn and that, as a matter of law, he assumed the risk of his injury by reaching for the overhanging metal while the belt was still running.

The first of these contentions stems from that fact that the actual injury was caused by Banks getting caught in a roller, and that the roller was not on the machine when Iron Hustler sold it to Brooklyn. By replacing the four flat metal pieces with fourteen rollers, Iron Hustler argues, Brooklyn significantly altered the device. In doing so, it complains, Brooklyn enlarged the risk of injury by some 250%—*i.e.*, it increased the number of "nip points" from four to fourteen. As the evidence fails to show whether Banks would have been injured had that alteration not been made, there can be no liability either in negligence or in strict liability.

The principles to be applied in determining the effect of Brooklyn's alterations differ somewhat as between the negligence and strict liability actions, although, in the end, the answer in this case is the same: it was a question for the jury.

### (1) *Negligence Claim*

In order to recover in a negligence action, a plaintiff must show not only that the defendant was negligent but that such negligence was the proximate cause of his injury. Where no extraneous event occurs between the time of the negligent act or omission and the infliction of the injury, proof of proximate causation is generally an uncomplicated matter; it is essentially a question of connecting two points, which the plaintiff either is, or is not, able to do. When an intervening event occurs, however, the issue of proximate causation becomes a bit more difficult.

The Court spoke to this, and laid down the general rules for sorting out liability in *State v. Hecht Company*, 165 Md. 415, 421–22, 169 A. 311 (1933):

"The connection between a defendant's negligence and the plaintiff's injury may be broken by an intervening cause. But in order to excuse the defendant, this intervening cause must be either a superseding or a responsible cause. It is a superseding cause, whether intelligent or not, if it so entirely supersedes the operation of the

defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury. It is a responsible one, if it is the culpable act of a human being, who is legally responsible for such act. The defendant's negligence is not deemed the proximate cause of the injury, when the connection is thus actually broken by a responsible intervening cause. But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation. Of course, the definition of a superseding cause implies that the defendant's negligence cannot be the cause of the injury.

If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another."

*See also Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977); Prosser, *Law of Torts,* § 44 (4th ed. 1971); Restatement of Torts 2d, §§ 440–453.

These principles, like many others, are often easier to state than to apply. When is an intervening force a superseding cause? Restatement of Torts 2d, § 442, sets forth a number of elements to be considered, among which are:

"(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; [and]

\* \* \* \* \* \*

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation."

*See also* §§ 451 and 442A; *Little v. Woodall,* 244 Md. 620, 224 A.2d 852 (1966); *Comstock v. General Motors Corporation,* 358 Mich. 163, 99 N.W.2d 627 (1959).

Whether the intervening act of a third party suffices as a superseding cause is generally for the trier of fact to determine. Only "when the evidence presented and the logical inferences deducible therefrom admit of but one conclusion" does the issue become a question of law. *Caroline v. Reicher,* 269 Md. 125, 131, 304 A.2d 831 (1973); *Segerman v. Jones,* 256 Md. 109, 259 A.2d 794 (1969).

These principles were applied in a product liability case in *Mazzi v. Greenlee Tool Co.,* 320 F.2d 821 (2d Cir.1963), where, at p. 826, the Court noted:

"Under traditional concepts of tort law, a defendant cannot be held responsible for his negligent acts if a subsequent force is the superseding cause of the injury. Restatement, Torts, § 440 (1934). Applying this principle to the case before us, the manufacturer would not be liable for plaintiff's injury, despite its own negligence, if the intervening alteration of the product was the superseding cause of those injuries. On the other hand, the mere fact that there has been some alteration of the product does not, as a matter of law, relieve the manufacturer of liability otherwise attaching to it.... This, it seems to us, must be the essence of any doctrine of 'substantial alteration', *and if the evidence was such that the jury could reasonably have found that the alternations in question were not a superseding cause of the injury, it*

*was error to direct a verdict on that ground."* (Emphasis supplied.)

*See also Webb v. Olin Mathieson Chemical Corporation,* 9 Utah 2d 275, 342 P.2d 1094 (1959).

### (2) *Strict Liability Claim*

■ Liability under § 402A is expressly conditioned upon the product reaching the user "without substantial change in the condition in which it is sold." Restatement of Torts 2d, § 402A(1)(b). The focus here is on the adjective "substantial"; not every change made to a product after it leaves the manufacturer suffices to preclude liability under § 402A. Perhaps because of the varying fact patterns from which the question arises, the courts have not yet settled on any uniformly expressed standard for judging when an alteration will or will not suffice to absolve the manufacturer of liability. Some courts stress the foreseeability of the alteration; others speak simply to whether the change made an otherwise safe product unsafe; and others, borrowing from the law of negligence, view the matter as whether the alteration constituted a supervening cause. *See Southwire Co. v. Beloit Eastern Corp.,* 370 F.Supp. 842, 856–57 (E.D. Pa.1974). If there is a common thread, it seems to be that, in most cases, the substantiality of the change is a question of fact, and if there is any conflict in the evidence, it is for the jury to determine. *See Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402 (3d Cir.1981); *Gordon v. Niagara Machine and Tool Works,* 574 F.2d 1182 (5th Cir.), *reh'g denied en banc* 578 F.2d 871 (5th Cir.1978); *Lenoir v. C.O. Porter Machinery Co.,* 672 F.2d 1240 (5th Cir.1982); *Hales v. Green Colonial, Inc.,* 490 F.2d 1015 (8th Cir.1974); *Dennis v. Ford Motor Company,* 332 F.Supp. 901 (W.D.Pa. 1971), *aff'd* 471 F.2d 733 (3d Cir.1973); *Karabatsos v. Spivey Co.,* 49 Ill.App.3d 317, 7 Ill.Dec. 158, 364 N.E.2d 319 (1977). *Compare Schreffler v. Birdsboro Corp.,* 490 F.2d 1148 (3d Cir.1974); *Coleman v. Verson Allsteel Press Co.,* 64 Ill.App.3d 974, 21 Ill.Dec. 742, 382 N.E.2d 36 (1978); *Craven v. Niagara Mach. and Tool Works, Inc.,* 425

N.E.2d 654 (Ind.App.1981); and *Martinez v. Clark Equipment Co.*, 382 So.2d 878 (Fla.App.1980), where the record sufficed to support a conclusion, one way or the other, as a matter of law.

### (3) *The Record Before Us*

Here, we think that a jury question was presented as to both negligence and strict liability. The defect alleged by Banks was not the use of flat supports by Iron Hustler; nor was it the substitution of rollers by Brooklyn. It was the failure of Iron Hustler to shield the underside of the conveyor. As Mr. Landry pointed out, whether flat pieces or rollers were involved is immaterial; the bottom part of the belt had to be, and was, supported, and whatever method was used to provide that support would create dangerous "nip points." Indeed, Mr. Easto, Brooklyn's foreman, observed that, had Banks been caught by a flat piece "nip point," his arm would likely have been amputated. From this record, a jury could rationally have found that (1) Iron Hustler was negligent in failing to provide a shield underneath the belt, (2) the conveyor was unreasonably dangerous when sold by Iron Hustler, and (3) the alterations made by Brooklyn did *not* suffice as a superseding cause or serve to substantially change the unreasonably dangerous condition of the device as manufactured and sold by Iron Hustler. Moreover, given the propensity of the flat pieces to shred the belt, a jury could also have found that Iron Hustler should have realized that its product was defective from an operational point of view and that a customer might be expected to replace the flat pieces with rollers, *i.e.*, that the alteration was a reasonably foreseeable one. *See Vanskike v. ACF Industries, Inc.*, 665 F.2d 188, 195 (8th Cir.1981), *cert. denied* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *Capasso v. Minster Machine Co., Inc.*, 532 F.2d 952 (3d Cir.1976); *Smith v. Verson Allsteel Press Co.*, 74 Ill.App.3d 818, 30 Ill.Dec. 562, 393 N.E.2d 598 (1979).

Thus, whether viewed in the context of a superseding cause or under any of the other standards employed to define "substantial change in condition" under § 402A, the issue as to both the negligence and strict liability counts was one for the jury.

## Assumption Of Risk

■ We reject Iron Hustler's final argument—that Banks may not recover because he assumed the risk of the injury—for the same reason that we rejected its "latent/patent rule" argument as to the negligence action. On this record, it was a jury question.

In *Kessler v. Bowie Machine Works, Inc.*, 501 F.2d 617, 621 (8th Cir.1974), the Court, applying South Dakota law, concluded:

"To support an assumption of risk defense ... it is well established that the defendant must show that an employee not only had knowledge of the existence of the risk and an appreciation of its character but also that he voluntarily accepted this risk, *i.e.*, that he had a sufficient amount of time and enough knowledge and experience to make an intelligent choice. Ordinarily, whether the plaintiff assumed the risk is a question for the jury."

*See also* Restatement of Torts 2d, § 496D, Comment d; also *Md. St. Fair & Agric. Soc. v. Lee,* 29 Md.App. 374, 348 A.2d 44 (1975); but *compare Lawrence v. Cavanaugh,* 249 Md. 176, 238 A.2d 859 (1968).

The testimony of Mr. Banks and Mr. Landry as to the nature of the danger, the nature and requirements of Mr. Banks' job, and the manner in which the accident happened sufficed to preclude a finding of assumption of risk as a matter of law.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIAL; APPELLEE TO PAY THE COSTS.