374 So.2d 207 (1979)
FORD MOTOR COMPANY
v.
William Maston BROADWAY.
No. 50783.
Supreme Court of Mississippi.
February 14, 1979.
Rehearing Denied September 12, 1979.[*]
Watkins & Eager, John L. Low, IV, Hassell H. Whitworth, Jackson, for appellant.
Farese, Farese & Farese, John Booth Farese, Ashland, for appellee.
Before ROBERTSON, WALKER and BROOM, JJ.
ROBERTSON, Presiding Justice for the Court:
This is a strict products liability suit. William Maston Broadway filed suit in the Circuit Court of DeSoto County against Ford Motor Company and C.F. Seago, doing business as Seago Tractor Company, for damages sustained by him when hit by a 1958 model Ford tractor with a hay-baling machine attached. His left collarbone and right thigh bone were fractured.
After plaintiff had rested, both Ford Motor Company and Seago moved for directed verdicts. The motion of Seago was sustained; the motion of Ford Motor Company was overruled. After a full trial, Ford moved for a peremptory instruction, which motion was overruled. The jury returned a verdict for $200,000 for the plaintiff, a 61-year old dairy farmer.
*208 On June 11, 1959, plaintiff's brother, Jordon Broadway, purchased a new 1958 model Ford tractor from Seago Tractor Company, the local Ford dealer in Coldwater, Mississippi. The tractor was used by Jordon Broadway and his two brothers, Maston and Turner Broadway, in their general farming and dairy farming operations without incident until September 27, 1969.
On that day, Maston and Turner Broadway were baling hay, using the 1958 model tractor to pull a hay-baling machine. The hay-baler was not functioning properly so Maston stopped the tractor and he and Turner worked on the hay-baler. In order to test the hay-baler, Maston stood on the ground on the right side of the tractor between the front and rear wheels and reached across the tractor to start it. The tractor started and moved forward; the wheel of the tractor ran over his right leg and the hay-baler struck his left shoulder. Maston testified that he thought he had the gear shift lever in "Park" which was the only position in which the tractor would start, it having an added safety switch mechanism which would keep it from starting if it were in gear. Later the plaintiff stated that the tractor must have been in gear, because two or three witnesses testified that after the accident the tractor would start in gear.
The plaintiff was injured on September 27, 1969, 10 years, 3 months, and 16 days after the initial sale of the tractor on June 11, 1959, to plaintiff's brother, Jordon Broadway.
On May 29, 1974, 4 years, 8 months and 2 days after the accident, Maston Broadway brought suit against Ford, the manufacturer of the tractor, and Seago, the local distributor, alleging as his principal ground the failure of the safety switch mechanism to work, thereby allowing the tractor to start while in gear. Suit was thus filed 14 years, 11 months and 18 days after the sale of the tractor by Seago to Jordon Broadway.
Ford's first assignment of error was that:
The Trial Judge erred in overruling Ford's demurrer and affirmative defense to the effect that the cause of action upon which suit was brought was barred by the expiration of the six-year limitation period applicable under § 15-1-49, Miss. Code Ann. (1972).
That Section reads:
"All actions for which no other period of limitation is prescribed shall be commenced within six years next after the cause of such action accrued, and not after."
This catch-all statute has been brought forward unchanged since 1880. The doctrine of strict products liability in tort was not accepted by this Court until July 8, 1966, when we decided State Stove Manufacturing Company, et al., v. Herbert H. Hodges, et ux., 189 So.2d 113. In 1880, when enacting the six-year statute of limitations, the Legislature did not contemplate nor take into consideration the fact that this Court some 86 years later would adopt the doctrine of strict products liability in tort.
We did apply the six-year statute: in Johnson v. Crisler, 156 Miss. 266, 125 So. 724 (1930), wherein we held that the cause of action accrued on the date a defective certificate of title was executed and not on the date damages were sustained; in Wilder v. St. Joseph Hospital, 225 Miss. 42, 82 So.2d 651 (1955), a medical malpractice suit where we again held that the cause of action accrued on the date of the negligence or omission and not on the date the negligence was finally discovered; and in M.T. Reed Construction Co. v. Jackson Plating Co., 222 So.2d 838 (Miss. 1969), which involved only property damage when a roof and the roof decking collapsed over six years after the building had been accepted by the owner. In Reed, we also said:
"Insofar as the determination of the issues of negligence in this case is concerned, it is to be noted that we are not confronted with the issue in futuro of personal injury which has been sustained by management, employees or the public ..." 222 So.2d at 839.
*209 The Mississippi Legislature has now set up a special statute of limitations for medical and pharmaceutical malpractice suits. In 1976, this statute was enacted:
"(1) No claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, nurse or pharmacist for injuries arising out of the course of medical or surgical treatment unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." [There are certain exceptions where the person injured is under disability of infancy or unsoundness of mind.] Section 15-1-36, Miss. Code Ann. (1978 Supp.).
Three of our sister states (Indiana, Georgia and Tennessee) have recently enacted special statutes of limitations to cover strict products liability in tort suits.
In 1978, Indiana enacted this statute:
"Sec. 5. Statute of Limitations. This section applies to all persons regardless of minority or legal disability. Notwithstanding IC 34-1-2-5, any product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer; except that, if the cause of action accrues more than eight (8) years but not more than ten (10) years after that initial delivery, the action may be commenced at any time within two (2) years after the cause of action accrues."
Oklahoma was not quite so liberal. Oklahoma's statute of limitations in strict product liability cases provides that after July 1, 1978, any product liability action is barred if not filed within six years from the date of initial sale of the product.
The Supreme Court of Oregon enforced this statute of limitations:
"In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of. Or.S. 12.115(1),"
in Johnson v. Star Machinery Co., 270 Or. 694, 530 P.2d 53 (1974). In Johnson, plaintiff's decedent was killed in an industrial accident in 1970. The offending machine was purchased from the defendant by the decedent's employer in 1959, some eleven years prior to the date of the accident. The suit sounded in negligence and strict products liability. The Supreme Court of Oregon enforced the new limitations law as written, and held that plaintiff's action was barred because the product in question was manufactured and sold more than ten years prior to the date of the accident.
The statute of limitations in strict products liability cases should strike a balance between the necessity of providing the consumer with adequate time within which to discover a defect and institute an action, and the need to provide the manufacturer with a definite period of liability and a date on which his exposure to suit ends.
While there is some doubt that our catch-all six-year statute meets these tests, since Mississippi has no special statute of limitations in strict products liability in tort actions, we hold that the six-year statute applies and, in personal injury actions, the statute begins to run from the time that injuries are sustained. If our interpretation is not in accord with its views, it is the legislature's prerogative to change or amend the present statute or enact a new one applying specifically to strict products liability cases.
Ford's next assignment of error is:
The Trial Judge erred in overruling Ford's motion for directed verdict at the conclusion of the appellee's case and in failing to grant a peremptory instruction for Ford in that there was no proof whatsoever of a defective condition in the particular tractor involved in this action, which condition was unreasonably dangerous to the user thereof.
In State Stove, supra, we said:
"[W]e conclude that the appropriate standards of responsibility are well stated in Section 402A of the American Law Institute's Restatement of Torts (Second), which we adopt insofar as it applies to a manufacturer of a product and to a contractor *210 who builds and sells a house with the product in it. It states:
Special Liability of Seller of Product for Physical Harm to User or Consumer  (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." 189 So.2d at 118. [Emphasis added].
Only two tractor manufacturers were placing auxiliary safety switch mechanisms on their tractors in 1958 when the tractor in the case at bar was manufactured and in 1959 when this tractor was sold. These two were Ford Motor Company and Massey Ferguson. Plaintiff's only expert, William Clayton, testified as to the safety switch mechanism: "It's an added safety precaution."
He admitted that the operator's manual contained this warning and these instructions:
"Starting the engine, the operator should always be seated on the tractor when starting the engine. Place the transmission selector lever in park position, depress the engine pedals and turn the ignition switch to the on position. Move the throttle lever to approximately the one-fourth open position and press the starter button. Use choke control as required." [Emphasis added].
Plaintiff testified that after repairing the hay-baler he stood on the ground, on the passenger's side of the tractor between the large rear wheel and smaller front wheel, and reached across to the driver's side to turn the ignition key or press the starter button. He ignored the manufacturer's warning placed in the operator's manual for his safety and protection: "Starting the engine, the operator should always be seated on the tractor when starting the engine," and "Place the transmission selector lever in park position".
The owner of the tractor, Jordon Broadway, in explaining why the tractor was not repaired until March 2, 1970, some five months after the accident, testified:
"Q. It was at the time that they picked  when you called them and notified them, they did pick it up, isn't that right?
A. Not immediately. I used the tractor some."
In State Stove, we held State Stove not liable, but the general contractor liable because he failed to follow the instructions of the manufacturer:
"The Court holds that State Stove has no liability here, under Restatement section 402A, (1) because the water heater as manufactured was not in `a defective condition unreasonably dangerous to the user or consumer or to his property'; and (2) because it was not expected to and did not reach the Hodges `without substantial change in the condition in which it * * (was) sold.' (3) Further, the negligent failure of Yates and Gary, through their agent Pittman, to follow the instructions of the manufacturer in installing the water heater, by failing to use a temperature relief valve, was the intervening, sole proximate cause of the explosion." 189 So.2d at 121. (Emphasis added).
Plaintiff's witness, Johnny Rowland, the mechanic at Seago who replaced the safety starter switch on March 2, 1970, testified:
"Q. Now, Johnny, when this tractor was first sold, in your opinion it was in a reasonably safe condition to be used for the purposes intended, wasn't it?
A. It was at that time.
.....
Q. Again, when y'all picked up and modified the clutch or whatever it was the second time, which had nothing to do with the transmission or the safety starter switch, again at that time, it is your opinion as an expert mechanic that it was in a reasonably safe condition to be used for the purposes intended, isn't that true?

*211 A. Yes, sir.
Q. Sir?
A. That's right.
Q. And so, whatever needed replacing after ten years and three months as I said in your judgment was something to be expected, is that right?
A. Normally 
Q. Through normal use.
A. Normally.
Q. And wear and tear, right?
A. Yes, sir."
William Clayton, plaintiff's only expert, testified that he knew nothing about the accident or the particular tractor involved until early 1974, approximately 15 years after the initial sale of the tractor and about 4 1/2 years after the accident. He further testified that he did not examine the safety switch mechanism in Broadway's 1958 model tractor, but ordinarily these safety switch mechanisms have about 15 component parts, that it is impossible to make each part exactly the same length, and that of necessity a manufacturer must establish reasonable tolerances and that if these parts are within the tolerances they are acceptable.
Clayton explained that if the 15 component parts in the safety switch mechanism were all on the long side of the tolerances, it would cause the plunger to overtravel and wear out faster. He said there was a possibility that this happened, but could not say that it did, because he was not employed in the case until 4 1/2 years later and, therefore, did not have an opportunity to examine the safety switch mechanism or measure any of its component parts.
In Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747 (1938), this Court said:
"Verdicts are to be founded upon probabilities according to common knowledge, common experience, and common sense, and not upon possibilities; and a verdict cannot convert a possibility or any number of possibilities into a probability." 182 Miss. at 652, 179 So. at 750.
In the later case of Elsworth v. Glindmeyer, 234 So.2d 312 (Miss. 1970), we said:
"Verdicts must rest on probabilities, not on bare possibilities".
and
"[B]elievable or credible evidence in civil cases is that which is reconcilable with the probabilities of the case and ... bare possibilities are not sufficient." 234 So.2d at 318.
There is no evidence in this voluminous record that the auxiliary safety switch in the Broadway 1958 model tractor was defectively designed or defectively manufactured. In fact, long usage without incident (10 years, 3 months and 16 days) bespeaks otherwise. We could almost take judicial notice that all things mechanical (in fact, all things human) eventually wear out.
The standard of care required of a manufacturer is succinctly stated in State Stove in this way:
"Strict products liability does not require a perfectly safe product."
and
"The manufacturer is liable strictly in tort only if (a) he puts on the market a product which is not reasonably safe, and (b) the plaintiff is injured as a result of a contemplated use of it." 189 So.2d at 121.
There being no evidence that the 1958 model tractor left Ford's hands on June 11, 1959, "in a defective condition unreasonably dangerous to the user" when used in the way intended and the way the manufacturer instructed that it should be used, the trial court should have granted the peremptory instruction requested by the defendant. See Hagans v. Oliver Machinery Co., 576 F.2d 97 (5th Cir.1978).
The judgment of the trial court is, therefore, reversed and judgment rendered here for the defendant.
REVERSED AND RENDERED.
THIS CASE WAS CONSIDERED BY A CONFERENCE OF THE JUDGES EN BANC.
PATTERSON, P.J., SMITH, P.G., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.
COFER, J., took no part.
NOTES
[*] Cofer., J., took no part in rehearing.