**Steve HEDGEPETH, Plaintiff,**

**United States Fidelity and Guaranty Company, Intervenor,**

v.

**FRUEHAUF CORPORATION, Defendant.**

**Civ. A. No. E83–0181(L).**

United States District Court, S.D. Mississippi, E.D.

March 17, 1986.

Stanford Young, Waynesboro, Miss., for plaintiff.

Hassell H. Whitworth, Watkins & Eager, Jackson, Miss., for defendant.

Hamilton & Boling, Meridian, Miss., for U.S. Fidelity & Guar. Co.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on motion of defendant Fruehauf Corporation (Fruehauf) for judgment notwithstanding the inability of the jury to reach a verdict. Plaintiff Steve Hedgepeth has filed timely response to defendant's motion.[1] The court has reviewed the memorandum with attachments submitted by defendant and has closely scrutinized the record in this case in considering the motion.

In this diversity action, Steve Hedgepeth sued Fruehauf to recover for injuries he received when he slipped and fell from the top of a tanker trailer manufactured by Fruehauf. Hedgepeth sought recovery under two theories of strict products liability recognized by Mississippi law: defective design in the manufacture and distribution of the tanker trailer without adequate safety features attached to the top of the trailer to prevent slippage; and failure to attach adequate warnings to the trailer indicating that a dangerous condition could develop in the absence of proper maintenance of the trailer. The case was tried before a jury in Meridian, Mississippi on February 10-11, 1986. Following closing argument by counsel, the jury was charged and retired to consider a verdict at approximately 4:00 P.M. The jury was unable to reach a verdict on the evening of February 11, and the court excused the jury at midnight with instructions to return to continue deliberations at noon on February 12. At approximately 1:00 P.M. on February 12, the court received a note signed by the jury foreman stating that the jury was "hopelessly deadlocked" and unable to reach a unanimous verdict. The court then declared a mistrial.

---

**1.** United States Fidelity and Guaranty Company was the workers' compensation carrier for Steve Hedgepeth's employer, Capitol Transport Company, at the time of his injuries and made mo- tion to intervene in this action for the limited purpose of asserting its contractual right of subrogation as to any recovery Hedgepeth received.

Fruehauf's instant motion requests the court to enter judgment in favor of defendant and to dismiss this action with prejudice. At the conclusion of plaintiff's case-in-chief, Fruehauf moved for a directed verdict on the issue of liability, which motion was denied by the court. Defendant's requested jury instruction D–1, a peremptory instruction on the issue of liability in favor of defendant, was also denied by the court. Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, the court, however, retains the power, upon proper and timely motion, to have judgment entered in accordance with a party's motion for a directed verdict even if a verdict was not returned by the jury after prolonged deliberations. *See Noonan v. Midland Capital Corp.*, 453 F.2d 459 (2nd Cir.), *cert. denied*, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972). The court employs the standard applicable to motions for a directed verdict or for judgment notwithstanding the verdict, *id.*, and the motion should be granted "only if the evidence points so strongly and overwhelmingly in favor of the moving party that the court believes reasonable persons could not arrive at a contrary verdict." *Dalton v. Toyota Motor Sales, Inc.*, 703 F.2d 137, 140 (5th Cir. 1983); *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). Utilizing this standard, and viewing all the evidence in a light most favorable to plaintiff, the court makes the following determinations based upon the evidence presented at trial.

Steve Hedgepeth was employed as a truck driver for Capitol Transport Company (Capitol) at the time he was injured. On November 20, 1979, Hedgepeth was directed by Capitol to drive a tractor-trailer rig owned by Capitol to Baton Rouge, Louisiana for the purpose of picking up a load of gasoline or diesel fuel and to make delivery of the fuel to a Texaco distributor in Picayune, Mississippi. Before embarking on his journey, Hedgepeth noticed that the tanker-trailer was, as he put it, "cruddy" with oil residue which had not been cleaned off the exterior of the tanker. Hedgepeth protested the condition of the tanker to his supervisors at Capitol, but he was told to either pull the tanker in its "cruddy" condition or go home for the day. With these instructions, Hedgepeth undertook the task assigned him by his employer.

During delivery of the fuel to the Texaco distributor at Picayune, Hedgepeth was required to climb onto the top of the tanker to open the hatches to provide proper ventilation so that the gas in the tanker would flow freely. Plaintiff testified that he mounted the tanker top at least three or four times during his stop in Picayune and that there was approximately one-quarter inch of oil on the rounded tanker top. As a result, plaintiff testified, the cowboy boots he was wearing became oil-soaked and slick.

Upon completion of the delivery to the Texaco distributor, Hedgepeth drove south out of Picayune en route to Slidell, Louisiana. A short distance out of Picayune Hedgepeth noticed that the middle hatch on the tanker had been left open. He pulled the rig off on the right side of the two-lane highway in such a position that the right wheels were lower than the left wheels, causing the tanker to be leaning to the right at some slight angle. He again mounted the tanker top and closed the open hatch. On his way back to the rear of the tanker, and while he was in a semi-crouch preparing to climb down the ladder, he heard the report of a vehicle's horn approaching the rear of the rig. He stood quickly and, in this movement, his feet slipped and he lost his balance and fell.

The tanker-trailer was manufactured by Fruehauf and sold directly to Capitol in April 1964 and was in continuous use by Capitol from that date until the date of Hedgepeth's injury on November 20, 1979. The tanker top was painted with non-skid paint when it left the hands of Fruehauf, but any such non-skid paint was either worn off or covered with oil at the time of plaintiff's injury. No other safety features were incorporated into the design of the tanker by Fruehauf, and Capitol had neither added nor removed any safety features on the tanker top. Beyond the deterioration of the non-skid paint, the tanker

was in substantially the same condition when it left Fruehauf as it was on the date of Hedgepeth's injury. Fruehauf is in the business of manufacturing and selling the type tanker-trailer rig on which Hedgepeth was injured.

The court has before it the trial transcription of the cross-examination of Steve Hedgepeth, which is quoted at length as follows:

Q: Now, on the date of this accident, when you went to work that morning and they told you that you were going to pull this trailer number 112, you went out to make an inspection of it, didn't you?

A: Yes, sir, I did.

Q: And you found, as you told us when you gave your deposition, that it had about one-fourth of an inch of oil on top of it?

A: Yes, sir ... They had flushed the inside of the trailer, but there was still oil placed on top of it. They had hauled oil in it the day before I got under it.

Q: And you knew that you saw the oil there, didn't you?

A: Right.

Q: And you knew it was slick?

A: Yes, sir.

Q: And, in fact, you went inside and told the terminal man that, "This thing's got oil on it, and it's unsafe to drive." That's what you told him?

A: That's what I told him.

Q: And he sent you to the safety man?

A: Right.

Q: And you repeated it to him, that it's got oil on it, it's slick, and it's unsafe to drive?

A: That's right.

Q: And then he refused to clean it for you?

A: They didn't clean it. I don't know if he refused or not, but they didn't clean it.

\* \* \* \* \* \*

Q: And I believe you said to him or us when you gave your deposition, quote, "It was real slick and real cruddy."

A: That's right.

Q: And you saw all of that and you knew it was there, didn't you?

A: I knew it was there.

Q: And you knew it was unsafe to walk on when it was in that condition?

A: Yes, sir.

Q: That is, you didn't need any sign or somebody to tell you that, when oil is sitting up on top of a piece of metal and you've got to walk on it, you knew that was slick and dangerous, didn't you?

A: Oil is slick.

Q: Well, you knew that then?

A: Yes, sir, but I had a job to do, sir.

Q: I understand that, sir; but you voluntarily went ahead, rather than having to go home and not earn your pay that day, you voluntarily went ahead, drove the truck, got up and down and walked on the top of it several times before you fell, didn't you?

A: Yes, sir, I did ... in order to keep my job, yes, sir, and support my family, I did that.

Q: I understand that; and, when you got up and walked on it on that day, you knew not only that it was oily and slick and cruddy and was dangerous and unsafe, as you put it, but you also knew it didn't have any so-called grid upon top of it, didn't you?

A: It didn't have no grid on it.

Q: Well, I mean, you could see that there was no grid?

A: Yeah, I could see.

Q: And, therefore, you knew that it had no grid on it?

A: I knew that it had no grid, right.

\* \* \* \* \* \*

Q: ... you were a grown man and you had been trucking for years. You knew because of the oil and the conditions there that day that it was slick and unsafe, and you were likely to fall, didn't you?

A: I knew it was unsafe, but I—

Q: Yes, sir, but you went ahead and walked on it, anyhow?

A: Yes, sir, I walked on it.

\*    \*    \*    \*    \*    \*

Q: I believe when you got to Picayune, again, that you had to go up and down the ladder and on top of the tanker three or four times, at least?

A: Yes, sir, that's correct.

Q: In fact, you told us in your deposition that you went up and down so much and walked on the top so much that your boots became oil-soaked before you left?

A: That's true.

Q: So, you knew when you got out there or whenever it was when you stopped, you knew the oil was up there, you knew your boots had become oil-soaked and were slick, and you went back up even again?

A: Yes, sir, I had to . . .

Q: Nobody held a pistol to your head and made you go, you went on your own initiative. You voluntarily went up there.

A: I was the driver of the truck. I was assigned to it. I had to see after it.

\*    \*    \*    \*    \*    \*

Q: So, at the time you fell, you say that you knew that [the tanker] had no non-skid paint on it?

A: No, sir, it didn't have no non-skid paint on it.

Q: And you knew that?

A: Yes, sir, I knew that.

Q: You knew it didn't have any grid built up there to walk on?

A: Yes, sir.

Q: You knew that?

A: Yes, sir.

Q: You knew that it had oil on it?

A: Yes, sir.

Q: And you knew that it didn't have any signs on it saying, "Look, if it's got oil on it, it's slick and it may be dangerous, and you may fall." You knew that, didn't you?

A: Yes, sir, I knew that.

From plaintiff's testimony on cross-examination, it is clear and the court credits as fact that (1) plaintiff was aware of the oil surface on the top of the tanker at the time he mounted the tanker top immediately before his fall, (2) plaintiff was aware that his boots had become oil-soaked and that it would be unsafe or dangerous to walk on the tanker top under such conditions, (3) plaintiff voluntarily chose to expose himself to such conditions, and (4) the absence of additional safety features on the tanker top, such as a grid, or a warning to put him on notice of the dangerous condition, was known, open and obvious to plaintiff at the moment of his fall.

Since before the seminal case adopting the principles of strict liability in tort under Mississippi products liability law, *State Stove Mfg. Co. v. Hodges*, 189 So.2d 113 (Miss.1966), *cert. denied*, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967), Mississippi has recognized the "open and obvious" defense in products liability actions. In *Harrist v. Spencer-Harris Tool Co.*, 140 So.2d 558 (Miss.1962), plaintiff alleged that the manufacturer of an oil drilling rig was negligent in constructing a ladder the lower rungs of which were angled at a slant below and inside the upper rungs. Plaintiff fell from the ladder as he attempted to climb. The Mississippi Supreme Court sustained defendant's demurrer to the declaration, applying the open and obvious rule:

> If we assume there were defects, we think they were apparent and obvious to a casual observer . . .
>
> No duty rests upon a manufacturer or seller to warn a purchaser of a dangerous design which is obvious. If this were not true, a manufacturer could not design and sell a pocket knife, axe, planer or gun.

140 So.2d at 561–62.

In *Ward v. Hobart Mfg. Co.*, 450 F.2d 1176 (5th Cir.1971), the Fifth Circuit, applying Mississippi law, utilized the open and obvious rule in reversing a judgment for plaintiff based upon negligent failure to warn and negligent design in the manufacture of a meat grinder. Plaintiff contended that the meat grinder was defectively designed because it failed to incorporate a safety guard to restrain users, like Ward,

from placing a hand in an electric meat grinder that was plugged in. Following *Harrist,* the Fifth Circuit held:

> The court in *Harrist* followed what appears to be the general rule in negligent design cases: where the alleged danger is open and obvious and the manufacturer has done everything necessary to insure that the machine will function properly for its designed purpose any duty to a future user has been fulfilled.

450 F.2d at 1180. *See also Jones v. Babst,* 323 So.2d 757 (Miss.1975) (utilizing the open and obvious rule enunciated in *Ward* in a negligent design case).

In a recent case, *Gray v. Manitowoc Co., Inc.,* 771 F.2d 866 (5th Cir.1985) (applying Mississippi law), the Fifth Circuit reaffirmed the viability of the open and obvious defense in a case brought on the theories of strict liability, implied warranty and negligence. Plaintiff alleged that his injuries were caused by a defect in the design of a crane and that the manufacturer had provided inadequate warnings of this defect. Significantly for purposes of the instant case, the appeal in *Gray* was from the district court's denial of defendant's motion for judgment notwithstanding the verdict after the jury had awarded damages to plaintiff. The Fifth Circuit reversed, stating:

> In light of the overwhelming evidence indicating that the existence of a blind spot in the 4100W was common knowledge in the construction trade, we must conclude that the testimony of Gray and his inexperienced co-worker did not create a jury question as to the knowledge or expectations of the *ordinary* observer or consumer. We conclude that no reasonable jury could have found that the blind spot of the Manitowoc 4100W was not open and obvious, nor could any reasonable jury have concluded that the 4100W was dangerous to a degree not anticipated by the ordinary consumer of that product.

771 F.2d at 871.

The open and obvious defense has equal vitality and validity in a case involving alleged failure to provide adequate warnings under Mississippi products law. *See Lenoir v. C.O. Porter Machinery Co.,* 672 F.2d 1240 (5th Cir.1982); *Ward,* 450 F.2d 1176 (5th Cir.1971).

■ This court recognizes, as did the court in *Gray,* that the open and obvious defense has been the subject of much scholarly debate and, indeed, with the assumption of risk defense discussed infra, possesses elements inimical to the theories of strict liability in tort.[2] The court is *Erie*-bound, however, in the absence of any sign from the Mississippi Supreme Court that this defense is repudiated or limited in some fashion, to hold that a manufacturer is under no duty to warn or adopt alternative designs when the danger associated with the use of a product is open and obvious to the user. Plaintiff's testimony at trial unequivocally established that the danger of walking in oil-slick cowboy boots on a tilted, metal tanker surface covered with oil was open, obvious and apparent to him. Therefore, the court is of the opinion that no reasonable jury could have concluded that the tanker manufactured by Fruehauf was unreasonably dangerous to a degree not anticipated by the ordinary consumer. Accordingly, defendant's motion for judgment notwithstanding the inability of the jury to reach a verdict should be granted.

Additionally, and as an alternative to the court's conclusion that judgment should be entered in favor of defendant on grounds that the danger was open and obvious to Steve Hedgepeth, the court concludes that Hedgepeth assumed the risk of his injury at the time he mounted the tanker top. Under Mississippi law, the defense is applicable when defendant can show the existence of three elements at the time of plaintiff's injury: (1) knowledge on the part of the injured party of a condition inconsistent with his safety; (2) appreciation by the injured party of the danger in the condition; and (3) a deliberate and voluntary

---

2. *See Gray,* 771 F.2d at 870 n. 3, 4.

choice on his part to expose his person to that danger in such a manner as to register assent to the continuance of the dangerous condition. *McLeod v. Whitten*, 413 So.2d 1020, 1022 (Miss.1982). Whether such injured party assumed a particular risk of harm is measured by a subjective standard, what the injured party *actually* knew, rather than the "reasonable man" standard. *Alexander v. Conveyers & Dumpers, Inc.*, 731 F.2d 1221, 1223–24 (5th Cir. 1984); *Herod v. Grant*, 262 So.2d 781, 782 (Miss.1972).

The court recognizes that, where a defense of assumption of risk overlaps and coincides with contributory negligence, the giving of an instruction on assumption of risk is, upon timely objection, reversible error. *Braswell v. Economy Supply Co.*, 281 So.2d 669 (Miss.1973). Here, however, defense counsel methodically prompted from Hedgepeth admissions on every element of assumption of risk under Mississippi law. Hedgepeth's counsel interposed no objection to such questioning, and, as stated, the court credits as fact the statements made by Hedgepeth on cross-examination.

In *McGowan v. St. Regis Paper Co.*, 419 F.Supp. 742 (S.D.Miss.1976), a case factually similar to the instant case, the court determined that the assumption of risk defense was a complete bar to recovery. There, plaintiff slipped and fell on an oily substance located on a ramp at the St. Regis facility. He sued St. Regis on a business invitee liability theory. On cross-examination at the non-jury trial, plaintiff admitted that he saw the oily substance on the ramp when he first arrived at the plant, and further admitted the elements of assumption of risk under Mississippi law. The court entered a judgment for the defendant, stating with particular relevance to the instant case:

> The undisputed facts of the instant case constitute one of the rare instances where the doctrine of assumption of risk as a complete bar to recovery is applicable, inasmuch as the plaintiff subjectively knew, as admitted in his sworn testimony, that the oily or greasy substance was present on the unloading ramp, that it constituted a dangerous condition, and that he voluntarily and freely was walking through the substance ...

419 F.Supp. at 746.

■ Thus, the assumption of risk defense retains viability under Mississippi law as a complete bar to recovery. Although the defense would logically be subsumed by the open and obvious defense in a products liability case, it has been applied in a products case under Mississippi law. *Alexander v. Conveyors & Dumpers, Inc.*, 731 F.2d 1221 (5th Cir.1984). The overwhelming weight of the evidence in this case, including Hedgepeth's sworn testimony, indicates that the assumption of risk defense is applicable here to completely bar plaintiff's recovery. Again, in the absence of a determination by the Mississippi Supreme Court that the defense of assumption of risk is inimical to the theories of strict liability in tort, this court is of the opinion that Hedgepeth assumed the risk of his injury when he voluntarily confronted the known dangers present on the tanker top.[3]

---

**3.** To the extent that plaintiff's ability to "voluntarily" confront the known danger on the tanker top was vitiated by the order of his immediate employer, Capitol, that he either pull the tanker in its oily condition or go home for the day, the court is of the opinion that Mississippi law recognizes such a defense to assumption of risk only in the master-servant or employer-employee context. *See Mississippi Export R. Co. v. Temple*, 257 So.2d 187, 190 (Miss.1972); *Elias v. New Laurel Radio Station, Inc.*, 146 So.2d 558, 561 (Miss.1962). The court has not found any cases addressing this specific issue under Mississippi law, and the parties have not briefed or argued this issue. However, the court concludes that, if faced with this issue, the Mississippi Supreme Court would adopt the rule announced in Restatement (Second) of Torts § 496E (comment b), which provides in part:

> The plaintiff's acceptance of the risk is to be regarded as voluntary even though he is acting under the compulsion of circumstances, not created by the tortious conduct of the defendant, which have left him no reasonable alternative. Where the defendant is under no independent duty to the plaintiff, and the plaintiff finds himself confronted by a choice of risks, or is driven by his own necessities to

Therefore, the court is of the opinion that evidence in this case points so strongly and overwhelmingly in favor of defendant that reasonable persons could not arrive at a contrary verdict.

Accordingly, it is ordered that defendant's motion for judgment notwithstanding the inability of the jury to reach a verdict should be granted. A separate judgment shall be submitted according to the local rules.

accept a danger, the situation is not to be charged against the defendant.

*See also Draper v. Airco, Inc.,* 580 F.2d 91, 102 (3rd Cir.1978).